# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AMY CRANDALL, | : |  |
| Plaintiff | : | CIVIL ACTION |
|  | : |  |
| v. | : | NO. 10-1431 |
|  | : |  |
| MICHAEL J. ASTRUE, | : |  |
| Commissioner of Social Security, |  |  |
| Defendant. |  |  |

## Memorandum

YOHN, J.                                                    October 5, 2011

Plaintiff, Amy Crandall, seeks judicial review under 42 U.S.C. § 405(g) of the final

decision of the Commissioner of Social Security (the "Commissioner") denying her claim for

disability insurance benefits under Title II of the Social Security Act (the "Act").  I referred the

matter to Magistrate Judge Timothy R. Rice, who submitted a report and recommendation

recommending that I affirm the Commissioner's decision to deny plaintiff disability benefits.

Plaintiff has filed objections to the report and recommendation. For the following reasons, I will

adopt the magistrate judge's report and recommendation and affirm the final decision of the

Commissioner.

## I.        Factual Background

At the time of the decision denying disability benefits, plaintiff Amy Crandall was thirty

years old. (R. 81-82.) She has more than a high-school education, speaks English, and worked

most recently as a licensed practical nurse. (R. 81.)  She lives with her husband and daughter,

who was three years old at the time of the hearing. (R. 79.)

Crandall alleges that she became disabled on November 17, 2005, as a result of autonomic nervous system dysfunction ("ANSD")[1] and vasodepressor syndrome with labile hypertension.[2] (R. 43, 117, 139.) Her medical records show a history of treatment for hypertension and ANSD beginning in 2005. (R. 236-37.)  In October of that year, Crandall began seeing her current primary-care physician, Dr. Karen E. Fox. (R. 141-42.) Dr. Fox noted at that time that Crandall had a history of venous insufficiency,[3] "trace edema"[4] in her legs and hands, and ankle swelling. (R. 226-27.) At a follow-up visit on November 2, 2005, Crandall reported that her legs were tired and hurt but that elevation or Tylenol sometimes provided relief.  (R. 225.) Dr. Fox prescribed hydrochlorothiazide[5] and ordered an ultrasound of Crandall's legs, which showed no evidence of blood clots. (R. 225, 229.) Crandall also underwent an electrodiagnostic evaluation of her legs in December 2005 at Dr. Fox's recommendation. (R. 205-06.) The test results were normal. (R. 205.)

---

[1] The autonomic nervous system is the portion of the nervous system that regulates the heart and glands. *Dorland's Illustrated Medical Dictionary* 1882 (31st ed. 2007) [hereinafter *Dorland's*]. ANSD, or dysautonomia, is a malfunction of that system. *Id.* at 583.

[2] Vasodepressor syndrome with labile hypertension is a condition in which arterial blood pressure fluctuates between the normal range and the hypertensive or hypotensive range. *Dorland's* at 909, 2055.

[3] Venous insufficiency is defined as "inadequacy of the venous valves and impairment of venous return from the lower limbs." *Dorland's* at 959.

[4] Edema is the presence of more than normal quantities of fluid in the intercellular tissue spaces of the body, often marked by swelling. *Dorland's* at 600.

[5] Hydrochlorothiazide is a diuretic often used in the treatment of hypertension or edema. *Dorland's* at 890.

In December 2005, Crandall began seeing Dr. Ramesh K. Adiraju, a cardiologist, for leg edema and labile hypertension. (R. 261.) He recorded that Crandall had a history of leg swelling, cramps, numbness, and tingling, but noted "no peripheral edema." (R. 261.) In order to rule out ANSD, Dr. Adiraju ordered an autonomic nervous system ("ANS") test. (R. 261.) The test revealed "evidence of parasympathetic abnormality, which was very mild." (R. 256.) On the basis of these results, Dr. Adiraju switched Crandall from hydrochlorothiazade to Coreg.[6] (R. 256.)

Dr. Adiraju continued to monitor Crandall throughout 2006 and noted her improvement with treatment on several occasions.  In April, Dr. Adiraju wrote that "[r]epeat ANS tests show significant improvement," and in May, he noted "stable and improved ANS status." (R. 250-51.) In July, Dr. Adiraju added Elavil[7] and ProAmatine[8] to Crandall's medications in response to continued leg cramps and fatigue and the results of an additional ANS test. (R. 248.) In October, Dr. Adiraju observed that "leg edema is completely resolved on ProAmatine." (R. 241.) By November, Crandall's ANS test showed "mild paradoxic parasympathetic activity but improved parameters." (R. 242.)

Crandall's medical records from 2007 catalog her continued symptoms and complaints despite improvement in her test results. In January 2007, Dr. Adiraju wrote that Crandall's leg

---

[6] Coreg is the brand name for a beta-adrenergic blocking agent used in the treatment of hypertension. *Dorland's* at 305, 422.

[7] Elavil is the brand name for a tricyclic antidepressant used in the treatment of chronic pain.  *Dorland's* at 64, 606.

[8] ProAmatine is the brand name for a medication used to treat individuals who experience a drop in blood pressure upon standing by stimulating the contraction of capillaries and arteries. *Dorland's* at 919, 1183, 1538, 2056.

cramps had "significantly improved" and that he was "encouraged . . . [because] a repeat ANS test in the office [a] couple of weeks ago showed significant improvement." (R. 236.) But Dr. Fox's notes from April 19, 2007, report edema, and Dr. Adiraju recorded symptoms of fatigue, leg swelling, and cramping on May 24, 2007. (R. 218, 235.) An ANS test performed in August 2007 showed "significant improvement," and an ultrasound in September 2007 showed no plaque deposits in the arteries of either of Crandall's legs. (R. 265, 303.) But by November, Crandall again reported experiencing cramps and fatigue, for which Dr. Adiraju recommended circulator boot treatment.[9] (R. 264.) These treatments were conducted in October and November 2007, and produced improvement for the first few days followed by the return of pain and edema. (R. 304.)

## II.    Procedural Background

Plaintiff filed an application for disability insurance benefits on July 13, 2006. (R. 117-21.) She alleged that she has been disabled since November 17, 2005, because she suffers from ANSD and vasodepressor syndrome with labile hypertension. (R. 139.) In her agency submissions, Crandall reported that her symptoms include shortness of breath; burning, tingling, and swelling of her legs and hands; and pain with extreme temperatures, sitting, standing, or walking continuously for longer than half an hour. She claimed that these symptoms limit her ability to concentrate at times; to drive for longer than half an hour; to climb more than six stairs; to carry more than 20 pounds; to sit, stand, or walk continuously for longer than half an hour at a time; and to sleep through the night. (R. 139, 147-53.)  She also claimed that her conditions

---

[9] Circulator boot treatment works by compressing portions of the leg in response to heart activity in order to improve circulation. (R. 292-93.)

caused her to be absent from work, work fewer hours, and be let go by her employer. (R. 139.)

Elsewhere in her submissions, Crandall described her daily activities as including bathing her

daughter; preparing meals for her family; changing her daughter's diapers; playing with her

daughter; paying bills; taking out "light" trash; doing household chores such as vacuuming or

laundry for half an hour at a time; unloading light groceries from the car; swimming; reading;

and watching television. (R. 147-50.)

Dr. Leland Patterson, an agency reviewer, evaluated Crandall's case. (R. 213.)  In a report

dated August 29, 2006, Dr. Patterson wrote that Crandall "had objective tests confirming

autonomic nerve dysfunction." (R. 213.) Nevertheless, he noted that "treatment produced

normalization" and concluded that the medical evidence did not support the severity of

Crandall's subjective complaints. (R. 213.)

On September 16, 2007, Dr. Adiraju submitted a medical source statement that was

considerably more bleak. (R. 266-70.)  While characterizing Crandall's prognosis as fair, he

nevertheless opined that her condition caused symptoms severe enough to interfere with her

concentration frequently; that she could walk three city blocks without rest; she could sit for 45

minutes continuously at one time and stand for 15 minutes; that she could stand less than two

hours in an eight-hour workday and sit for about two hours in that time; that she must walk for

15 minutes twice during an eight-hour workday; that she needs one or two unscheduled breaks

per shift; that her legs must be elevated during 30% of an eight-hour workday; that she can lift 10

pounds frequently and 50 pounds occasionally; and that her symptoms would cause her to miss

three days of work a month. (R. 266-70.)

Crandall's application was denied on August 30, 2006, and she filed a timely request for a

5

hearing on September 29, 2006. (R. 75.) In her appeal form, Crandall noted no change in her condition. (R. 157.)

Plaintiff was represented by counsel at her hearing before the administrative law judge ("ALJ"), which took place on October 2, 2007, and November 28, 2007.  (R. 19, 42.) At the hearing, Crandall testified about her daily life and physical limitations. She testified that she is the primary caregiver of her three-year-old daughter because her husband works long hours as a truck driver. (R. 48-49.) On a typical day, Crandall will complete range-of-motion exercises for twenty minutes after waking up; bathe and dress herself and her daughter without resting; make her daughter breakfast; make beds and complete light housework; play with her daughter; take her daughter outdoors; pay bills; make dinner; clean up after meals; elevate her legs at night while watching television; and repeat her range-of-motion exercises before bed. (R. 51-55.) She sometimes has difficulties with these activities and experiences tingling and numbness, which will cause her to stop and rest. (R. 55.) Crandall testified that her mother comes over most days from 11:00 in the morning until 4:00 in the afternoon and helps watch her daughter. (R. 51-52.) Crandall tries to minimize the physical strain of her daily life by making dinner with a Crockpot, using paper dishware, and allowing her daughter to bathe herself and wash her hair under Crandall's supervision. (R. 51-52, 62.) Crandall drives with her daughter locally to run errands and lifts her 41-pound daughter to see herself in the mirror about twice a week, and occasionally takes out the trash. (R. 49-50, 55, 57.) Although she testified that she can drive for 20 minutes, her sister drives when she needs to go grocery shopping. (R. 45, 50.) Her sister also helps with housework on weekends. (R. 51.) On weekends, Crandall will accompany her husband and daughter to a nearby park or to her cousin's house, where she goes swimming. (R. 53, 56.)

Crandall also testified before the ALJ about her medical history, condition, and symptoms. According to Crandall, her edema is not a problem until she walks. (R. 57.) When swelling does occur, she will sit down and elevate her legs for 15 minutes. (R. 58.) She experiences numbness and tingling in her lower legs, feet, and hands throughout her waking hours. (R. 58.) Her medications can cause fatigue and a rapid heartbeat, and decrease her ability to concentrate. (R. 58, 60.) Crandall experiences leg cramps lasting 15 to 20 minutes four or five times a day. (R. 61.) Crandall also testified that her doctor had mentioned the possibility that she may have primary lymphedema, which Crandall opined could lead to elephantitis or require vascular surgery.[10] (R. 32-33.)

Marlene Hychalk, Crandall's mother, also testified before the ALJ. (R. 64-69.) Hychalk corroborated Crandall's testimony in many respects; she testified to observing Crandall struggle with heavy housework, to helping Crandall with child care regularly, and to witnessing Crandall's sister help with household cleaning and grocery shopping. (R. 64-69.)

Dr. Brad Rothkopf testified as a medical expert after having reviewed the medical evidence. (R. 21.) He provided the ALJ with an explanation of Crandall's ANSD, diagnostic tests that could have been and had been performed, and possible treatments. (R. 22-25.) He testified that ANSD is not a "listed impairment," and that Crandall's symptoms were not analogous to any listing. (R. 26-27.) He opined that the limitations he would apply for Crandall are "less than the limitations from, from the doctor," and he advised against sitting or standing

---

[10]Although the ALJ allowed Crandall to testify as to her discussions with Dr. Adiraju, the ALJ noted that testimony from the doctor himself would be "preferable evidence" as Crandall is "not a medical professional and her understanding of what he told her may not be the best." (R. 31-32.)

for six hours at a time. (R. 26, 30.) With respect to Crandall's edema, Dr. Rothkopf testified that

the condition would "always come back," but that it is a problem that can be treated and

managed. (R. 31.) He also testified that there was nothing in Crandall's medical records to

suggest lymphedema or vascular surgery. (R. 33-34.)

Finally, Dr. Carolyn Rutherford testified before the ALJ as a vocational expert. The ALJ

inquired about the employment prospects of "an individual of this claimant's age, education and

past work history . . . [who] is capable of performing a range of light work that affords the

opportunity to sit or stand in 15 to 20-minute [intervals]." (R. 37.) In response to this

hypothetical, Dr. Rutherford testified that the individual would not be able to perform Crandall's

prior work, but that he or she could work as a packer, assembler, or inspector/sorter. (R. 37-38.)

On December 8, 2007, the ALJ issued an opinion denying Crandall's claim.[11] (R. 75-82.)

The ALJ found that Crandall met the insured-status requirements of the Act through December

31, 2010. (R. 77.) In applying the required five-step analysis to determine whether the claimant is

disabled, the ALJ found that Crandall had not engaged in substantial gainful activity since

November 17, 2005, and that she suffers from ANSD, which qualifies as a severe impairment.

(R. 77.) Relying on the uncontradicted testimony of the medical expert, Dr. Rothkopf, the ALJ

ruled that Crandall does not have an impairment listed in or analogous to the impairments listed

in part 404 of the regulations. 20 C.F.R. pt. 404, subpt. P, app. 1 (2011); (R. 77-78.) After

---

[11] Crandall submitted a subsequent disability claim and was deemed disabled as of
December 9, 2007—the day after the decision at issue here. (Pl.'s Br. and Statement of Issues in
Supp. of Req. for Rev. ("Pl.'s Br.") at 1 n.1.) That finding does not affect my review of the
record as it stood when the ALJ denied Crandall's first application. *See Jackson v. Astrue*, 402 F.
App'x. 717, 718 (3d Cir. 2010) ("Standing alone, the fact that the Commissioner subsequently
found claimant to be disabled does not warrant remand or reversal") (not precedential).

considering the testimony of Crandall, her mother, and Dr. Rothkopf, as well as Crandall's

medical records and Dr. Adiraju's medical source statement, the ALJ concluded that Crandall has

the residual functional capacity to perform light work with a sit-stand option at 15- to 20-minute

intervals. (R. 78-81.) Although the ALJ found Crandall's testimony generally credible, she

determined that it "ha[d] not established wholly work preclusive limitations." (R. 80.) The ALJ

attributed limited weight to the report of Dr. Adiraju because it "is more restrictive than

[Crandall's] own demonstrated abilities." (R. 80.) She attributed more weight to Dr. Rothkopf's

testimony, which she found credible, that Crandall had not shown any significant side effects

from her treatment, and that aside from avoiding sitting or standing for prolonged periods,

Crandall is only limited by how she feels after certain activities. (R. 80.) The ALJ found that

Crandall is unable to perform any past relevant work. (R. 81.) However, in light of the testimony

of the vocational expert, the ALJ found that given Crandall's age, education, work experience,

and residual functional capacity, she was capable of performing various jobs that exist in the

national economy and thus was not disabled under the Act from November 17, 2005, through the

date of the decision on December 8, 2007. (R. 77-82.)

Plaintiff timely requested review by the Appeals Council on December 17, 2007, which

the Council denied on January 25, 2010. (R. 1-4, 15.) As a result, the ALJ's decision became the

final decision of the Commissioner.  Plaintiff filed this action on April 5, 2010, seeking judicial

review of the final decision under 42 U.S.C. § 405(g).  I referred the matter to a magistrate judge,

who in a report and recommendation dated March 31, 2011, concluded that the Commissioner's

decision was supported by substantial evidence and recommended that I affirm the

Commissioner's decision.  Plaintiff has now filed objections to the magistrate judge's report.

9

### III.    Standards of Review

I review *de novo* the parts of the magistrate judge's report and recommendation to which Plaintiff objects. 28 U.S.C. § 636(b)(1)(C).  I may  "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

In contrast, a district court's review of the Commissioner's decision is deferential.  A district court may review the Commissioner's "factual findings only to determine whether the administrative record contains substantial evidence supporting the findings." *Allen v. Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005). As the Supreme Court has explained, "[s]ubstantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). This standard requires "more than a mere scintilla" of evidence but "somewhat less than a preponderance of the evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (citations omitted).  In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986) (citations omitted).  However, the court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [it] would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.

### IV.    Discussion

#### A.    Introduction

To qualify for disability insurance benefits under the Act, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When evaluating a claim for disability, the Commissioner conducts a five-step sequential analysis as codified in the regulations. 20 C.F.R. § 404.1520; *see also Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91 (3d Cir. 2007). The Commissioner determines (1) whether the claimant engaged in "substantial gainful activity" during the alleged period of disability; (2) whether the claimant has a severe physical or mental impairment that significantly limits his or her ability to perform basic work activities; (3) whether the impairment meets or is medically equivalent to one of the "listed impairments" in appendix 1 of the regulations; (4) whether the claimant has the "residual functional capacity" to perform "past relevant work"; and (5) whether, given the claimant's residual functional capacity, age, education, and work experience, the claimant can perform "other work" in the national economy. 20 C.F.R. § 404.1520(a)(4); *see also Poulos*, 474 F.3d at 91-92. The claimant bears the burden of proof at each of the first four steps, but the burden shifts to the Commissioner at step five. *Poulos*, 474 F.3d at 92.

Here, the plaintiff has objected to the magistrate judge's report and recommendation with regard to nearly every issue raised in the initial request for review; these objections are little more than a restatement of the arguments the magistrate judge previously considered. Crandall objects to (1) the ALJ's decision to accord her treating physician's opinion limited weight; (2) the adequacy of the hypothetical question the ALJ posed to the vocational expert; (3) the ALJ's credibility determination regarding Crandall; (4) the ALJ's assessment of the lay witness's credibility; and (5) the magistrates judge's recommendation not to remand the case to the ALJ for consideration of post-hearing evidence. For the following reasons, I conclude that these

11

objections are without merit and adopt the magistrate judge's report and recommendation and affirm the final decision of the Commissioner.

**B.      The ALJ's Decision to Accord Dr. Adiraju Limited Weight**

Crandall argues that the ALJ erred in according limited weight to an assessment completed by her treating physician, Dr. Adiraju, which identified an array of work-preclusive limitations. Specifically, Crandall argues that the ALJ's rejection of Dr. Adiraju's findings is not supported by the record because the ALJ cited no contradictory medical evidence. In support of this assertion, Crandall advances two sub-arguments: (1) Dr. Adiraju's clinical findings support rather than contradict his medical source statement; and (2) Dr. Rothkopf offered no medical opinion regarding Crandall's functional limitation, much less a contrary opinion.

"Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).  The regulations provide that treating physicians' opinions will be granted controlling weight where they are well supported by medical evidence and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 416.927(d)(2).  "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. Where the opinion of a treating physician conflicts with that of a non-treating physician, the ALJ may "choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ did not reject the opinion of Dr. Adiraju outright. Rather, she accorded it "limited weight" and instead accorded Dr. Rothkopf's testimony "more weight." (R. 80.) She based this determination on the fact that Dr. Adiraju's assessment was "more restrictive than claimant's own demonstrated abilities." (R. 80.) Furthermore, this determination finds implicit support in the ALJ's observation that "while it is recognized that the claimant has some significant limitations, her treating specialist has noted some improvements." (R. 80.) The ALJ's summary of Dr. Adiraju's treatment of Crandall stresses the optimistic tone of his clinical findings:

> [S]ubsequent treatment notes from Dr. Ramesh Adiraju show claimant underwent ANS testing and was diagnosed with autonomic dysfunction. Since then, claimant has been managed by Dr. Adiraju and a repeat ANS test showed *significant improvement*; on May 7, 2006 claimant's condition was noted as *stable and improved*. . . . ANS testing of October 12, 2006 was noted to show *improved parameters* . . . . On August 23, 2007, Dr. Adiraju reported claimants as continuing with treatment and noted *significant improvement* . . . .

(R. 80) (emphasis added). Thus, claimant's own testimony and the prior notes of her treating doctor provide substantial evidence in the record inconsistent with Dr. Adiraju's medical source statement.

Crandall's argument that no medical evidence supports the ALJ's decision to accord Dr. Adiraju limited weight is without merit. To begin, Dr. Rothkopf clearly offered a medical opinion contrary to Dr. Adiraju's. He disagreed with the limitations Dr. Adiraju identified in his assessment and testified that Crandall's limitations were "less than the limitations from, from the Doctor and more limitations from the patient. . . . how she felt when she did this or that." (R. 26.) In Dr. Rothkopf's expert medical opinion, Crandall had not shown significant side effects from her treatment, should not sit or stand for six hours at a time but otherwise was limited only by

how she felt after certain activities, and should continue to receive compression treatments. (R. 26, 30.) This differs starkly from Dr. Adiraju's assessment that Crandall could sit for only 45 minutes continuously and stand for only 15 minutes. (R. 268.) Furthermore, as the ALJ's decision clearly emphasizes, the treatment notes and tests ordered by Dr. Adiraju showed improvement over time for which Dr. Adiraju's bleak medical assessment of September 16, 2007, did not appear to account.  Dr. Adiraju's clinical findings are not as consistent with his medical source statement as Crandall contends.

Taking the entire record into consideration, including Dr. Rothkopf's medical opinion, Dr. Adiraju's treatment notes, and Crandall's self-reported daily activities, I have no trouble concluding, as the magistrate judge did, that the ALJ's decision to give Dr. Adiraju's opinion limited weight is supported by substantial evidence.

### C.    The Adequacy of the ALJ's Hypothetical Question

Next, Crandall argues that the ALJ's hypothetical question to the vocational expert cannot support the Commissioner's denial of benefits because it did not incorporate the limitations suggested by Dr. Adiraju. The magistrate judge found no error in the ALJ's hypothetical question because he concluded that the ALJ properly accorded Dr. Adiraju's opinion limited weight. Although the plaintiff did not make an explicit objection to the magistrate judge's resolution of this issue in his report and recommendation, I will, nevertheless, address the matter.

In performing step five of the disability analysis, the ALJ may, and quite often does, ask a vocational expert's opinion, by way of a hypothetical question, about the available jobs in the national economy that the claimant can perform in light of the claimant's alleged residual functional capacity. *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). The Third Circuit

14

has explained that "'the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). The hypothetical question "must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Rutherford*, 399 F.3d at 554. Where a hypothetical excludes "medically supported and otherwise uncontroverted" limitations, the ALJ may not rely on the vocational expert's testimony. *Id.*

There are two main methods by which a claimant may challenge an ALJ's hypothetical question: (1) by arguing that the hypothetical question failed to include limitations that the ALJ identified in the residual functional capacity ("RFC") assessment, or (2) by arguing that the ALJ "failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert." *Id.* at 554 n.8. At bottom, arguments of the second sort challenge the RFC assessment itself. *Id.* The Third Circuit has held that where alleged limitations "were reasonably discounted by the ALJ" in making the RFC assessment, and the hypothetical question accurately reflected the RFC determination, "the ALJ [is] entitled to rely upon the vocational expert's response[] as substantial evidence." *Id.* at 555.

As explained above, the ALJ properly accorded Dr. Adiraju's medical questionnaire limited weight. Accordingly, the ALJ determined that the limitations identified by Dr. Adiraju were not credibly established. Thus, it was not error to exclude those limitations from the hypothetical question, and the vocational expert's answer to the hypothetical constitutes substantial evidence upon which the ALJ is entitled to rely.

### D.      The ALJ's Determination of Claimant's Credibility

Crandall next argues that the ALJ erred in assessing her credibility.  The ALJ found that "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, and that while the claimant's statements are generally credible, she has not established wholly work preclusive limitations." (R. 80.) The ALJ's reasoning shows that she relied on several factors that she believed were inconsistent with work-preclusive limitations: (1) Crandall's medical history, which showed improvements in her condition over time; (2) her daily activities as the primary care giver for her three-year-old daughter; (3) her ability to drive; and (4) her ability to remain active with household cleaning, cooking, and excursions to the park. (R. 80.)

Crandall attacks the ALJ's credibility determination in two ways. First, she asserts that the ALJ relied on impermissible factors to determine that work-preclusive limitations had not been established. Second, Crandall argues that the ALJ's characterizations of these factors are inaccurate and based on patent factual mistakes. I find that the ALJ's opinion accurately portrayed Crandall's self-reported abilities and that the ALJ properly considered these abilities in concluding that Crandall had not established "wholly work preclusive limitations."

To begin, the Commissioner's regulations describe a process for assessing a claimant's subjective complaints. First, the ALJ must identify a "medically determinable impairment that could reasonably be expected to produce [the] symptoms" that the claimant alleges. 20 C.F.R. § 416.929(b). Then, after the ALJ identifies that impairment, he or she must "evaluate the intensity and persistence of [the] symptoms" to determine the degree to which they limit the claimant's capacity to work. 20 C.F.R. § 416.929(c)(1). Thus, the ALJ is required to "determine the extent

16

to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft*, 181 F.3d at 362; *see also* 20 C.F.R. § 416.929(c). In making these determinations, the ALJ will consider all of the available evidence, including (1) the claimant's daily activities; (2) the duration, location, frequency, and intensity of the claimant's pain and other symptoms; (3) the claimant's precipitating and aggravating factors; (4) the type, dosage, effectiveness, or side effects of the claimant's medication; (5) the treatment that the claimant receives other than medication; (6) any measures used by the claimant to relieve the symptoms; and (7) other factors concerning functional restrictions or limitations due to pain or other symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

Contrary to Crandall's contentions, the ALJ did not "reject" Crandall's testimony or find her "not fully credible." Rather, the ALJ summarized her testimony accurately, implicitly crediting Crandall's account of her daily activities, the nature of the assistance she receives from her family, and the ameliorative steps she takes to reduce the impact of her condition. The ALJ's decision to limit Crandall to light work with a sit-stand option accounts for the great majority of Crandall's subjective complaints, including her inability to sit, stand, or walk for extended periods of time, and her inability to perform heavy lifting. (R. 78.)  Moreover, the ALJ explicitly found Crandall to be "generally credible." Nevertheless, although the ALJ concluded that Crandall's testimony was credible, she found that it did not establish disability. In other words, Crandall's testimony, while credible, was not enough—and herein lies Crandall's real quarrel, not the credibility determination in her favor.

According to Crandall, "the Third Circuit has long held that sporadic and transitory activities, such as school, hobbies, housework, social activities or use of public transportation,

17

cannot be used to show ability to engage in substantial gainful activity." (Pl.'s Br. at 17.)

Contrary to Crandall's suggestion, the factors the ALJ relied on here were neither sporadic nor

transitory. Crandall, by her own admission, prepares meals for her family, performs light

cleaning, and bathes and cares for her three-year-old daughter on a *daily* basis. (R. 51-53.) In any

given *week*, she will also run local errands, pay bills, drive her daughter around the neighborhood

in the car, lift her 41-pound daughter, take out light trash, accompany her family to the park, visit

her cousin's home, which is a half-hour drive away, and go swimming. (R. 49-50, 53, 55-57.)

Crandall is a far cry from the plaintiffs in the string of cases she cites.[12] The factors discussed by

the ALJ were properly considered under the law of this circuit.

Additionally, to the extent that Crandall desires this court to re-weigh the evidence and

emphasize different parts of her testimony than the ALJ did, she is limited by this court's role.

This court may only review the ALJ's decision to determine whether it is supported by

substantial evidence, *Hartranft*, 181 F.3d at 360, and may not re-weigh the evidence, *Williams v.*

*Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, the

ALJ did not make any patent factual mistakes as Crandall contends. Rather, the ALJ's conclusion

---

[12] None of the cases Crandall relies upon support her argument, as the plaintiff in each case is easily distinguishable. *See, e.g.*, *Jesurum v. Secretary of HHS*, 48 F.3d 114, 119 (3d Cir. 1995) (asserting that a single trip out of state two years before hearing is insufficient to support a finding of ability to engage continuously in substantial gainful activity); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (reasoning that occasional household chores and church attendance were insufficient evidence of ability to work in the face of uncontradicted medical evidence of disability); *Dorf v. Bowen,* 794 F.2d 896, 902 (3d Cir. 1986) (holding that the ALJ cannot infer non-disability from mere fact of claimant's marriage without more); *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981) (finding that grocery shopping and two isolated hunting trips do not negate disability).

that Crandall's subjective complaints were not wholly work preclusive is supported by substantial evidence and thus will not be disturbed.[13]

### E.   The ALJ's Assessment of Ms. Hychalk's Credibility

Crandall objects to the magistrate judge's determination that the ALJ properly evaluated the lay testimony given at the hearing. In particular, Crandall argues that the "ALJ's failure to make a credibility finding regarding witnesses who appear and testify at an administrative hearing is reversible error." (Pl.'s Br. at 22.) The only lay witness Crandall presented was her mother, Marlene Hychalk. The ALJ summarized Hychalk's testimony as follows:

> Claimant's mother . . . said that claimant tries to vacuum and will have to stop and rest. Claimant was reported to sometimes having to stop peeling potatoes due to numbness and tingling in her hands. According to claimant's mother, claimant's sister will occasionally help claimant and offer to go to the store, hang claimant's clothes, and on weekends do claimant's cleaning.

(R. 79.) This testimony corroborated the testimony of Crandall, which the ALJ found to be "generally credible." (R. 80.) Nevertheless, Crandall asserts that the ALJ erred because she did not make an explicit finding as to Hychalk's credibility. I disagree.

---

[13] As described above, the ALJ highlighted several aspects of Crandall's testimony and her medical records that she believed were inconsistent with work-preclusive limitations. (R. 80.) Each of these is supported by substantial evidence in the record: (1) although recurrent, Crandall's medical condition showed improvement over time (R. 236, 241-42, 250-51, 265, 303); (2) Crandall was the primary care giver for her three-year-old daughter (R. 48-49); (3) Crandall is able to drive and does not suffer from episodes of syncope (R. 45, 49-50); and (4) Crandall remains active with household cleaning, cooking, and excursions to the park. (R. 50-53.)

In support of this argument, Crandall cites *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112 (3d Cir. 2000). Crandall's reliance is misplaced—both are easily distinguishable.

In *Van Horn*, the Third Circuit found that an ALJ's denial of disability benefits was not supported by substantial evidence. 717 F.2d at 872. In remanding the case, the Third Circuit remarked that "we would expect [the ALJ] at least to state that he found a witness not credible before wholly disregarding his testimony. Indeed if th[e] ALJ did in fact find [claimant] and all his witnesses devoid of credibility, we cannot understand why he would not have stated some reason for that conclusion." *Id*. at 873-74. These statements, however, must be understood in the context of the case. The Third Circuit in *Van Horn* remanded not merely because of the ALJ's failure to make a credibility finding as to the lay witnesses, but rather because there was "simply no competent evidence in th[e] record supporting the ALJ's conclusion." *Id*. at 874.

In *Burnett*, the Third Circuit again addressed a case in which the ALJ disregarded lay testimony without explanation. 220 F.3d at 122. Although the ALJ explained why he had concluded that the claimant's testimony regarding her symptoms was not credible, he failed to even mention the testimony of two lay witnesses that corroborated claimant's testimony. *Id*. The Third Circuit took this occasion to address its decision in *Van Horn*, writing that "[i]n *Van Horn,* we stated we expect the ALJ to address the testimony of such additional witnesses." *Id*. Notably, the Third Circuit found error in the ALJ's failure to *address* the testimony of lay witnesses—not in his failure to make an explicit finding as to credibility. Again, as in *Van Horn*, in *Burnett*, this error by the ALJ was only one of many. *Id*. at 126.

20

Unlike in *Van Horn* and *Burnett*, where the ALJ disregarded the testimony of the lay witnesses altogether, in this case, the ALJ did address the testimony of Hychalk, Crandall's mother. She summarized Hychalk's testimony and noted several instances in which it corroborated Crandall's testimony. (R. 79.) Furthermore, the ALJ found Crandall to be "generally credible" (R. 80), in marked contrast to the ALJ's determination in *Van Horn* and *Burnett* that the claimants lacked credibility. *Van Horn*, 717 F.2d at 873; *Burnett*, 220 F.3d at 122. Although the ALJ did not explicitly state that she found Hychalk's testimony to be credible, that finding is implicit in both her accurate recounting of Hychalk's testimony and in her crediting of Crandall's testimony.[14] Therefore, I will overrule this objection.

### F.    Post-Hearing Evidence

Finally, Crandall argues that remand is warranted so that the ALJ may consider medical evidence that post-dates both hearings and the ALJ's decision. The new evidence that Crandall would like to introduce consists of the treatment notes of Dr. Paul J. DiMuzio, a vascular surgeon who treated Crandall in March 2008, three months after the decision of the ALJ.[15] In the notes, Dr. DiMuzio writes that "I do believe [Crandall] has elements of chronic venous insufficiency and possibly lymphedema. I do not see a surgically correctable problem." (R. 307.)

---

[14]Furthermore, because the ALJ found that Crandall's testimony, while credible, was not sufficient to establish work-preclusive limitations, and Hychalk only corroborated this testimony, an explicit determination that Hychalk's testimony was or was not credible could not change the ultimate outcome of the ALJ's decision —Crandall's testimony is still insufficient to establish disability.

[15] These notes were submitted and incorporated into the record on June 3, 2008, while the matter was pending before the Appeals Council. (R. 306-12.)

As a general rule, "evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). In very limited circumstances, however, a reviewing court may remand a case to the Commissioner for reconsideration in light of the additional evidence. Specifically, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. 405(g); *see Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991). Accordingly, in order to qualify for this remand option, three requirements must be satisfied: (1) the additional evidence must be "new"; (2) it must be "material" to the determination of plaintiff's disability benefits claim; and (3) there must "good cause" for plaintiff's failure to present the new evidence in a prior proceeding. *See Matthews*, 239 F.3d at 593. It is the claimant's burden to establish these requirements—a burden Crandall has not carried. *See, e.g.*, *id.* at 595; *Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985). Assuming that the evidence is "new,"[16] Crandall has failed to establish that it is both material and that she had "good cause" for failing to present it in either of the two hearings the ALJ conducted.

---

[16]Additional evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). It is not "new" if it is "merely cumulative of what is already in the record." *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Dr. DiMuzio's records may not even be "new." His records are largely cumulative of the medical evidence submitted to the ALJ. Even references to lymphedema and venous insufficiency can be found elsewhere in the record. (R. 32-33, 226.)

New evidence is "material" for the purposes of determining eligibility for remand under section 405(g) if it is "relevant and probative" and there is "a reasonable possibility that the new evidence would have changed the outcome of the [Commissioner]'s determination." *Szubak*, 745 F.2d at 833. Additionally, "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id*.

The new evidence Crandall seeks to introduce fails to meet these definitions of materiality. To begin, Crandall has not demonstrated that Dr. DiMuzio's diagnosis, if it can be called that, did not result from a deterioration of her condition.  Her consultation with and examination by the physician occurred three months after the ALJ's decision to deny benefits. (R. 306.) Although his treatment notes may recount aspects of her medical history from the relevant time period,[17] they also incorporate post-decision observations and testing—thus she has not demonstrated that the new evidence relates to the relevant time period. (R. 306-12.)

Furthermore, Crandall has not shown a "reasonable possibility" that the new evidence would have changed the ALJ's determination. Dr. Dimuzio's notes about her symptoms are largely duplicative of the medical evidence already before the ALJ, as was his recommended course of treatment, compression treatments. Even his opinion that Crandall "has elements of chronic venous insufficiency and possibly lymphedema" can be found elsewhere in the record. For example, Crandall testified before the ALJ that Dr. Adiraju suspected lymphedema, and Dr.

---

[17] The relevant time period is November 17, 2005, to December 8, 2007.

Fox's notes from October 10, 2005, show "venous insufficiency" under past medical history. (R. 32-33, 226.) Thus there is no reason to believe that the submission of Dr. DiMuzio's notes would have changed the outcome.

Even ignoring the lack of materiality, Crandall has not demonstrated good cause for her failure to incorporate this evidence into the record before the ALJ. Crandall contends that good cause exists because "although Dr. Adiraju suspected chronic venous insufficiency or some form of lymphedema prior to the ALJ's decision, the referral to Dr. Dimuzio and testing which confirmed the diagnosis occurred after the ALJ's decision." (Pl.'s Br. at 26.) Here, Crandall conflates the requirement that the evidence be "new" with the requirement of "good cause"; to say that the evidence is new is not to say that good cause exists for failing to obtain and submit it earlier. Crandall cites *Felder v. Sullivan*, No. 92-1695, 1992 U.S. Dist. LEXIS 17437 (E.D. Pa. Oct. 23, 1992), in support of her argument. That case is inapposite. In *Felder*, the district court found good cause where "the plaintiff ha[d] shown that her indigent status prevented her from obtaining the sophisticated testing" she sought to introduce on remand. *Id*. at *4. Crandall has made no similar allegations. Nor was Crandall unrepresented like the claimant in *Szubak*, where good cause was found to exist by virtue of her pro se status. 745 F.2d at 834. Given that Crandall was referred to a vascular surgeon by Dr. Fox as early as April 2007, I cannot find good cause for her decision to wait eleven months to pursue such treatment. (R. 218.) Thus, Crandall has failed to establish two mandatory requirements for a remand, and so her request for remand is denied.

**V.      Conclusion**

For the above reasons, I will overrule Crandall's objections to the magistrate judge's report and recommendation. The ALJ's decision is supported by substantial evidence, and consequently, I will affirm the denial of the Commissioner. An appropriate order follows.